

**SIGNED this 8th day of May, 2015**

_Shelley D. Rucker_
Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

In re:

                                                        No.  13-13184
                                                        Chapter 7

ELBERT DONALD WALKER and
RHONDA PITTS WALKER,

        Debtor;

JAMES R. PARIS, TRUSTEE

        Plaintiff

v

                                                      Adversary Proceeding
                                                      No.  14-1051

CINDY WALKER,

        Defendant.

*Appearances for James R. Paris, Trustee*

> Nancy A. Cogar
> Richard P. Jahn, Jr.
> 1200 Mountain Creek Road
> Suite 160
> Chattanooga, TN 37405

*Appearances for the Defendant*

> R. Dee Hobbs
> Bell & Hobbs
> 1217 First Tennessee Bldg.
> 701 Market Street
> Chattanooga, TN 37402

## MEMORANDUM

The Plaintiff Trustee James Paris ("Plaintiff" or "Trustee") has filed this adversary proceeding against the Defendant Cindy Walker ("Defendant") who is the daughter of the debtors Elbert and Rhonda Walker ("Debtors") to recover the alleged fraudulent transfer of two pieces of real property or their value from the Defendant pursuant to 11 U.S.C. § 548 and § 550. The Trustee has moved for partial summary judgment[1] regarding his fraudulent transfer claim. [Doc. No. 14]. The Defendant opposes the motion on the basis that there are genuine disputes as to material facts with respect to whether the Defendant provided value for the transfers she received and whether Mrs. Walker was insolvent at the time of transfers. [Doc. No. 18]. The Trustee has filed a response to the Defendant's opposition briefing. [Doc. No. 19]. Both parties have submitted evidence and affidavits in support of their positions. For the reasons stated below, the court will grant the Trustee summary judgment on the fraudulent transfer claim in the amount of $51,000. As to the value of the two pieces of property in excess of $51,000, the

---

[1] The Trustee's request for summary judgment is partial because he has two theories of recovery – fraudulent transfer and preference. The Trustee has not moved for summary judgment on his claims that the transfers were preferences pursuant to 11 U.S.C. § 547.

2

Trustee's motion will be denied.

## I.    Background

Because the Plaintiff Trustee is the party moving for summary judgment, the court must view the facts in the light most favorable to the Defendant. The Debtors filed their Chapter 7 Bankruptcy Petition on June 28, 2013. [Bankr. Case No. 13-13184]. Their Summary of Schedules indicated that they had assets totaling $3,273,620.76 and liabilities of $14,104,843.49. [Bankr. Case No. 13-13184, Doc. No. 22]. In their Statement of Financial Affairs, in response to Question No. 3.c., the Debtors stated that they had provided the Defendant with the amount of $5,000 on May 17, 2013 and had provided the Don Walker Management Account (3rd parties' funds) with $78,000 on May 17, 2013. [Bankr. Case No. 13-13184, Doc. No. 21].

The Trustee has filed an affidavit outlining the facts associated with the two alleged fraudulent transfers from the Debtors to the Defendant prior to their bankruptcy filing. [Doc. No. 14-1, Affidavit of Chapter 7 Bankruptcy Trustee, James R. Paris ("Paris Aff.")]. The Trustee asserts that he has reviewed the bank account records of the Debtors. Paris Aff., ¶ 4. He has analyzed the transfer of two pieces of real estate from the Debtors to the Defendant on May 17, 2013. He has provided exhibits pertaining to the records of those transfers. *See* [Doc. No. 14-1, Exhibits A-H]. Based on the schedules filed by the Debtors and the affidavit filed by the Trustee, the record indicates that the Debtor Don Walker managed several real estate properties for a variety of clients, including some family members. Paris Aff., ¶ 5. Mr. Walker maintained a bank account entitled "Don Walker d/b/a Management Account," Account No. 1961 ("Management Account"), with First Tennessee Bank. Mr. Walker deposited his rental income into this account. *Id.* Mrs. Walker had signing authority on the account, and the Trustee asserts that "[t]his was not used as a trust account, as the Walkers transferred their own funds into it freely prior to

bankruptcy. They used funds in this account as their own." *Id.* at ¶ 6.

The Trustee asserts the following facts about two additional bank accounts held by the

Debtors:

> At all times material in 2013 prior to bankruptcy, Don Walker also maintained a
> bank account at First Tennessee Bank (Account 1508) known as "Don Walker
> Construction Account". This account was primarily used to operate the
> construction side of Don Walker's businesses. Rhonda Walker has signature
> power on this account.

> At all times prior to bankruptcy, the Debtors also had a joint personal account
> with First Tennessee Bank (Account 836). The Debtors transferred their own
> funds from this account in and out of their construction and client management
> accounts freely prior to bankruptcy.

Paris Aff., ¶¶ 6-7. The court will refer to the Account No. 1508 as the "Construction Account"

and the Account No. 836 as the "Personal Account".

The Defendant does not dispute that she was the recipient of two pieces of real property.

She states that on May 17, 2013, Mr. Walker represented her in the acquisition of two pieces of

real property, one located at 9004 Fuller Road and one located at 6861 Standifer Gap Road

(collectively "Properties"). The Properties are located in Chattanooga, Tennessee. Paris Aff., ¶ 9.

Mr. Walker, acting through a power of attorney executed by Defendant, titled the Properties in

the name of his daughter, the Defendant Cindy Walker. *See* Paris Aff., ¶¶ 9-10; [Doc. No. 18-5,

Affidavit of Cindy Walker in Reponse to Plaintiff's Motion for Summary Judgment ("C. Walker

Aff."), ¶ 4]; [Doc. No. 14-1, Exs. A, B]. Exhibits A and B are copies of the Special Warranty

Deeds associated with the Properties indicating that the Defendant is the new owner. *Id.*

There is no dispute that the funds for the acquisition came from the checking accounts of

the Debtors. The Trustee alleges that on May 17, 2013, the Debtors made a number of financial

transfers between their various accounts in order to purchase the Properties for the Defendant.

*See* [Doc. No. 14-1, Exs. C-1 through G1].

In order to purchase the Properties, $134,899.50 was deposited into the Management Account on May 17, 2013. Exhibit C-1 is a copy of the May 2013 transaction report for the Management Account, showing $134,899.50 deposited into that account on May 17, 2013. [Doc. No. 14-1, Ex. C-1]. Five separate deposits were made: $87,000; $27,000; $10,000; $8,000; and $2,899.50.

With respect to the sources of the $87,000 deposit, Exhibit C-3 is a copy of the transactions bank statement for the Personal Account dated May 31, 2013. The statements indicate that the Debtors withdrew $78,000 from the Personal Account on May 17, 2013 by check no. 43090. [Doc. No. 14-1, Ex. C-3]. Exhibit D-1 is a copy of check number 43090 from the Personal Account in the amount of $78,000. [Doc. No. 14-1, Ex. D-1]. Exhibit D-2 is a copy of the deposit slip indicating a currency deposit of $9,000 and a deposit of $78,000 with the notation "43090" beside the amount of $78,000. The deposit slip is dated May 17, 2013 and shows the funds were deposited into the Management Account. These two amounts bring this deposit to $87,000. [Doc. No. 14-1, Ex. D-2]. Exhibit D-2 also shows a notation relating to check number 043090 that states "reimburse 45000—king phillips note/cindy 33000 repayment." *Id.*

With respect to the source of the $27,000 deposit, Exhibit C-2 is a copy of a checking account withdrawal stub indicating a withdrawal of $27,000 from the Construction Account on May 17, 2013. [Doc. No. 14-1, Ex. C-2].

With respect to the source of the $10,000 deposit, Exhibit F-1 is a copy of a Deposit Detail sheet relating to the Management Account indicating that the deposit of $10,000 was made on May 17, 2013. The Deposit Detail reflects accounting information, and it contains two lines. The first line has "Property" as "CW TIS," "Unit" as "6861 SG," "Account" as "4000 Rental Income," "Memo" as "5 yr storage bldg use," and "Amount" as $5,000. The second line

5

references "Property" as "CW TIS," the "Unit" as "6861 SG," the "Account" as "3021 CW

Reimbursables," the "Memo" as "loan from Don," and the "Amount" as $5,000. The two lines

total $10,000. The evidence of the "loan" is Exhibit F-3, which is a check from the Personal

Account for $5,000 payable to the Management Account. [Doc. No. 14-1, Exs. F-1, F-2].

With respect to the $8,000 deposit, Exhibit E-1 is another copy of a Deposit Detail sheet

relating to the Management Account indicating a deposit in the amount of $8,000 made on May

17, 2013. Like Exhibit F-1, this Deposit Detail also has accounting information which identifies

the "Property" as "CW TIS," "Unit" as "6861 SG," "Account" as "1007 Other Receivables,"

"Memo" as "Brent" and "Amount" as $8,000. The Defendant, her mother, her brother, and the

bookkeeper have stated in their affidavits that there were accounts maintained between family

members which reflected transactions and debts between them. Those statements and these

entries raise factual issues regarding what was owed to the Defendant. C. Walker Aff., ¶ 5; [Doc.

No. 18-2, Affidavit of Rhonda Walker in Response to Plaintiff's Motion for Summary Judgment

("R. Walker Aff."), ¶¶ 4-5]; [Doc. No. 18-3, Affidavit of Brent Walker in Response to Plaintiff's

Motion for Summary Judgment ("B. Walker Aff."), ¶ 3]; [Doc. No. 18-4, Affidavit of Janice

Long in Response to Plaintiff's Motion for Summary Judgment ("Long Aff."), ¶ 4]. As to the

source of the $2,889.50 deposit, there is no additional explanation provided by the Trustee.

There is no dispute that the Properties were purchased with these deposits. Exhibit G1 is

a copy of check number 36227 from the Management Account made out to First Tennessee Bank

in the amount of $81,722.22. The bottom of the check references "Cindy Walker." [Doc. No. 14-

1, Ex. G1]. Exhibit H1 is a copy of check number 36228 from the Management Account made

out to First Tennessee Bank in the amount of $69,242.81 which also references "Cindy Walker"

on the left bottom side of the check. [Doc. No. 14-1, Ex. H1]. Exhibit H-3 indicates that check

numbers 36227 and 36228 were withdrawn from the Management Account on May 17, 2013,

and the proceeds were used to purchase the Properties. [Doc. No. 14-1, Ex. H-3].

      In addition to the purchase of the Properties for the Defendant, additional sums were

spent for her benefit. The Trustee asserts in his affidavit that:

> An analysis of the Debtors' accounts and records also shows that following these
> purchases and up to June 28, 2013, the Debtors spent an additional $18,056.50 on
> improvements to these same two properties. An analysis of the Debtors' records
> shows that an additional $13,520.41 was spent on improvements to 9004 Fuller
> Road and $4,536.09 was spent on improvements to 6861 Standifer Gap Road.
> There is no evidence in the Debtors' books and records that the Defendant gave
> any consideration in exchange for these expenditures.
>
> At the same time the Fuller Road and Standifer Gap properties were transferred in
> May 2013, both Debtors were Defendants in a lawsuit in the Chancery Court of
> Hamilton County Tennessee, Docket # 11-0536. This suit was filed by a creditor,
> FirstBank, on July 13, 2011. It sought a money judgment in excess of
> $6,000,000.00 associated with the Debtors' breach of numerous promissory note
> obligations and guaranty agreements.
>
> As Chapter 7 Trustee, I am familiar with the value of the Debtors' assets and the
> extent of their liabilities in May and June, 2013. Based on a review of their
> records, the petition and my knowledge of the net values of their properties, the
> Debtors were balance sheet insolvent by at least $10,000,000.00 on May 17,
> 2013. This condition did not change materially from then to the petition date.
>
> The unsecured creditors of Don and Rhonda Walker will not receive 100% [of]
> their claims in the Chapter 7 distribution, based on assets expected to be
> recovered and claims to be allowed.

Paris Aff., ¶¶ 17-20.

      The Defendant opposes the motion for summary judgment and has filed several

affidavits, as well as documents in support of her argument that genuine disputes as to material

facts exist regarding the Trustee's fraudulent transfer claim. In her affidavit the Defendant asserts

that she lives in Prague in the Czech Republic and that she is the daughter of the Debtors. C.

Walker Aff., ¶¶ 1-2]. She further states that she owns 23 properties, and that the last two

properties she purchased were the Properties at issue in this adversary proceeding. *Id.* at ¶ 3. She

asserts that she receives the rental income on these properties and that this income is reflected on her income tax returns. Her father d/b/a Don Walker Rentals manages her properties for her while she lives abroad, and she has appointed her father as her attorney in fact to help conduct the purchases of the real estate. *Id.* at ¶¶ 4-5. She has attached the power of attorney she has given to her father, Don Walker, as Exhibit A to her affidavit. *See* [Doc. No. 18-6, Ex. A]. She states that: "Don Walker Rentals maintained a management account in which receivables were deposited and payables spent out in the maintenance and management of my properties. I was not involved directly in the business of renting these properties or managing receivables and payables and I relied upon Don Walker Rentals for those matters." *Id.* at ¶ 5. She has relied on her father to manage her properties and has been willing to borrow money from family members to acquire properties. *Id.* at ¶ 6. She was planning on using the money earned from her real estate to fund her future retirement.

      With respect to the purchase of the Properties, the Defendant stated the following:

> In 2013, I was aware that my father was actively looking for additional properties for me to purchase. While I cannot recall now all of the details surrounding the purchase of the two houses in May of 2013, I was given specifics at the time. I left the financial arrangements entirely up to my father with the stipulation that any money to be borrowed from family to complete the purchases would have to be repaid solely with the cash from my rental properties. I understood that Don and Rhonda Walker were going to provide a portion of the monies needed to complete the purchases, and I do not deny that they did in fact provide part of the funds to buy these tracts. Most of the money required to make these purchases, though, came from me.

> At the time of the purchases, I had cash available in the management account to pay part of the sales price for the two properties. Meanwhile, my brother and my aunt provided a portion of the funds by way of loans. In fact, the $30,000.00 loan from my aunt is being paid from my rental income at present. Further, a part of the money used to buy the tracts came from the sale of a secured note to Baptist International Missions, Inc. ("BIMI") for $45,000 in April of 2013. This note was owed to me by King Henry Phillips, who purchased a residence from me in October of 2009.

*Id.* at ¶¶ 7-8. Exhibit B to her affidavit is a copy of a 2009 warranty deed to Mr. Phillips, a deed

of trust, and the assignment of the deed of trust to BIMI. [Doc. No. 18-7]. Exhibit C is a copy of

the check from BIMI. The Defendant explains that "the check was inadvertently made payable to

my father and was then deposited for the benefit of my brother by mistake. I was made aware of

this later, and these funds were transferred by my brother to my ledger and used as a portion of

the monies to complete the purchases of the properties." C. Walker Aff. ¶ 9.

> In concluding her affidavit, the Defendant asserts:

> At no time have Don and Rhonda Walker ever purchased real estate for
> themselves which they titled in my name. Rather, I have purchased only what are
> my properties, often with their assistance, but the real estate in my name is mine
> and mine alone. We have never titled and retitled property to each other as a
> means of defrauding anyone.
> I do not deny that the purchases of these properties occurred about six weeks
> before my parents filed a bankruptcy petition; however, neither at the time of the
> purchases nor at any other point did my parents inform me of any need for
> bankruptcy protection. I was unaware that a filing was being made until they
> informed me afterward.

*Id.* at ¶¶ 10-11.

> The Defendant has also provided an affidavit from the Debtor Rhonda Walker in support

of her opposition to the Trustee's motion for summary judgment. R. Walker Aff. In her affidavit

she asserts that her daughter, the Defendant, was one of several clients for whom Don Walker

Rentals managed a number of real properties. R. Walker Aff., ¶¶ 4-5. Mrs. Walker corroborates

her daughter's version of the events:

> With regard to the purchases of the two properties in question, Cindy had
> accumulated funds which were applied to buy the two tracts. Some portion of the
> purchase funds came from Brent Walker, and Don Walker and I put some of our
> own funds into the purchase as well. I believe that approximately $51,000.00 of
> the total needed to buy the two properties (just under $151,000) came from funds
> Mr. Walker and I provided.

> In addition to the purchase of the properties, it was necessary to spend money to
> improve them. The necessary funds were generated from Cindy and did not come

from Mr. Walker and me. My daughter did have to rely on a loan from my sister,
Martha Nowlin, in the amount of $30,000.00, but these funds were provided
solely by Cindy Walker's aunt, not from Mr. Walker and me. They were
deposited into the management account and applied to cover the purchase and
improvement of the two properties.

R. Walker Aff., ¶¶ 6-7.

Mrs. Walker also contends her insolvency remains a question of fact. In her affidavit she

contends:

Although I am a Debtor in this matter, there remains a question of whether I am
liable on a particular debt allegedly owed to FirstBank of over six million dollars.
I have raised a defense and counterclaim to the guaranty I signed at the demand of
the bank on the grounds that their actions violated the Equal Credit Opportunity
Act, 15 U.S.C. Section 1691 and Regulation B, 12 C.F.R. Section 202.7. The case
which was filed in the Hamilton County Chancery Court as case no. 13-0947,
*FirstBank v. Elbert Donald Walker and Rhonda P. Walker*, remains pending. If I
am successful, I aver that I am [not] insolvent at all.

R. Walker Aff., ¶ 8.

The Defendant's brother, Brent Walker, has also submitted an affidavit in support of the

Defendant's opposition to the Plaintiff's motion for summary judgment. B. Walker Aff. In his

affidavit he states:

In April and May of 2013 I was aware that Cindy Walker was purchasing two
properties through her power of attorney, Don Walker. My sister lives and works
out of the country and has long operated her properties through her attorney in
fact. I made a loan to her to help come up with the monies needed to complete the
two properties. I do not know how much money my father and mother contributed
to the purchases but understand they did in fact pay something towards the sales.
In addition, my aunt advanced money to my sister to enable her to either complete
the purchases or make improvements to the structures.

I also paid the sum of $45,000.00 out of my savings account at First Tennessee
Bank which represented funds that were the property of Cindy Walker to begin
with. Through her attorney in fact, she sold a note for $45,000.00 in April of
2013, but the funds were deposited into my account. I simply transferred the
funds to the management account and understand they were used to make the
purchase of the properties that are at issue in this matter.

B. Walker Aff., ¶¶ 4-5. In addition, the former office manager and bookkeeper of the records of

Don Walker Rentals, Janice Long, provided the court with an affidavit. Long Aff. Ms. Long

asserts that Don Walker Rentals managed properties owned by Cindy Walker and that the

company kept a separate ledger for the Defendant's real estate activities. Long Aff., ¶¶ 4-5.

 In response to the Defendant's opposition to his motion for summary judgment, the

Trustee filed a supplemental affidavit in support of his motion. [Doc. No. 21, Supplemental

Affidavit of Chapter 7 Bankruptcy Trustee, James R. Paris ("Supp. Paris Aff.")]. This

supplemental affidavit states:

> I am custodian of the books and bank account records of the Debtors. In the
> records of the Don Walker Client Management Account (First Tennessee Acct.
> 1961) are records of a $45,000.00 deposit that was made into the Management
> Account on May 31, 2013.
>
> The deposit ticket reflects that it is "proceeds of sale from 1416 Bush Road (King
> Phillips)". However, the check used to make this deposit was from the
> Management Account itself, check number 36236 made payable to Cindy Walker
> in the amount of $45,000.00. This check is dated May 21, 2013.
>
> Attached hereto [as] Exhibit A are copies of the check and the deposit documents
> in question from May 31, 2013.
>
> I had reviewed this transaction previously, but I did not regard it as any
> consideration for the purchase of the two houses titled in Cindy Walker's name on
> or about May 17, 2013.
>
> Attached as Exhibit B are the Bank Statements of the Don Walker Client
> Management Account for April and May 2013. I have reviewed all the deposits
> for both months. There is no record of a $45,000.00 deposit into this account from
> Brent Walker or BIM in April or May, 2013. I also find no record of a $30,000.00
> deposit from Martha Nowlin into this account in April or May of 2013.
>
> With regard to improvements made to the two properties after May 17, 2013 and
> before June 28, 2013, funds were spent out of the Client Management account for
> that purpose. The sum of $4,536.09 was spent on 6861 Standifer Gap Road. The
> sum of $13,520.41 was spent on 9004 Fuller Road.

Supp. Paris Aff., ¶¶ 2-7.

## II.      Jurisdiction

28 U.S.C. §§ 157 and 1334, as well as the general order of reference entered in this

district provide this court with jurisdiction to hear and decide this adversary proceeding.  The

Plaintiffs' action regarding the avoidance of a fraudulent transfer or a preference is a core

proceeding.  *See* 28 U.S.C. § 157(b)(2)(F), (H).

## III.     Standard of Review

Federal Rule of Bankruptcy Procedure 7056 makes Federal Rule of Civil Procedure 56

applicable to bankruptcy adversary proceedings. *See* Fed. R. Bank. P. 7056. Summary judgment

is appropriate if there is no genuine dispute as to any material fact and the moving party is

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden is on the moving party

to show conclusively that no genuine issue of material fact exists, and the Court must view the

facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving

party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v.

Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *60 Ivy Street Corp. v. Alexander*, 822

F.2d 1432, 1435 (6th Cir. 1987); *Kava v. Peters*, No. 09-2327, 2011 WL 6091350, at *3 (6th Cir.

Dec. 7, 2011).

Once the moving party presents evidence sufficient to support a motion under Fed. R.

Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The

nonmoving party is required to come forward with some significant probative evidence which

makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *60 Ivy Street*, 822 F.2d at 1435. The moving

party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing

on an essential element of the nonmoving party's case with respect to which the nonmoving

party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th

Cir. 1996).

Rule 56 outlines the requirements for defeating a motion for summary judgment. Rule

56(c) and (e) provide guidance to the non-moving party:

> **(c) Procedures**
>
> **(1)** *Supporting Factual Positions*. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. . . .
> **(e)  Failing to Properly Support or Address a Fact.** If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
> **(1)** give an opportunity to properly support or address the fact;
> **(2)** consider the fact undisputed for purposes of the motion;
> **(3)** grant summary judgment if the motion and supporting materials— including the facts considered undisputed—show that the movant is entitled to it; or
> **(4)** issue any other appropriate order.

Fed. R. Civ. P. 56(c), (e).

For an affidavit to create a genuine dispute as to any material fact, it must do more than

"reiterate [the] allegations in vague and conclusory terms." *Emmons v. McLaughlin*, 874 F.2d

351, 355 (6th Cir. 1989). A non-moving party cannot withstand a motion for summary judgment

by providing a "bare legal conclusion" or without providing "specific information that might

conceivably create a genuine issue." *Id.* In addition,

> . . . applying Rule 56(e), the non-movant may not simply attack the credibility of the movant's affiants without a supporting factual showing. . . . It is not sufficient that the affidavit merely recite facts to which a competent witness will testify at trial. Nor can the affidavit consist only of conjective, conclusory allegations as to ultimate facts, or conclusions of law.

13

*Treinish v. Glazer (In re Glazer)*, 239 B.R. 352, 356 (Bankr. N.D. Ohio 1999).

### IV.    Analysis

11 U.S.C. § 548 allows a trustee to:

avoid any transfer . . . of an interest of the debtor in property, or any obligation . .
. incurred by the debtor, that was made or incurred on or within 2 years before the
date of the filing of the petition, if the debtor voluntarily or involuntarily –
. . . .
(B)(i) received less than a reasonably equivalent value in exchange for such
transfer or obligation; and
(ii)(I) was insolvent on the date that such transfer was made or such obligation
was incurred, or became insolvent as a result of such transfer or obligation;
(II) was engaged in business or a transaction, or was about to engage in business
or a transaction, for which any property remaining with the debtor was an
unreasonably small capital;
(III) intended to incur, or believed that the debtor would incur, debts that would
be beyond the debtor's ability to pay as such debts matured; or
(IV) made such transfer to or for the benefit of an insider, or incurred such
obligation to or for the benefit of an insider, under an employment contract and
not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B). The statute defines "value" as "property, or satisfaction or securing of

a present or antecedent debt of the debtor, but does not include an unperformed promise to

furnish support to the debtor or to a relative of the debtor . . ." 11 U.S.C. § 548(d)(2)(A). As it

does with § 547 claims, 11 U.S.C. § 550 allows a trustee to recover property for the benefit of

the estate where a court has avoided transfer of the property pursuant to 11 U.S.C. § 548. 11

U.S.C. § 550. A transfer includes: "each mode direct or indirect, absolute or conditional,

voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in

property." 11 U.S.C. § 101(54).

As one bankruptcy court has explained:

The primary purpose of fraudulent transfer law is to avoid transactions that
"unfairly or improperly deplete a debtor's assets or that unfairly or improperly
dilute the claims against those assets." Transfers that are deemed fraudulent and
capable of being avoided fall into two distinct categories of transactions—those

made by means of actual fraud, and those deemed constructively fraudulent. Under either theory, the burden of proof falls to the party claiming that fraud has occurred, and this burden must be met by a preponderance of the evidence.

*In re Eubanks*, 444 B.R. 415, 422 (Bankr. E.D. Ark. 2010) (quoting *In re S.W. Bach & Co.*, 435

B.R. 866, 875 (Bankr. S.D.N.Y. 2010)). In the constructive fraud context of Section 548(a)(1)(B)

"no finding with regard to the state of mind of the transferor is necessary." *In re Eubanks*, 444

B.R. at 425. The constructive fraud section:

carries no element of intent; instead, the sole issues are whether the Plaintiff received less than reasonably equivalent value—determined by comparing the value of the property transferred with the value of what the debtor received—in exchange for the transfers in question and whether the Plaintiff was insolvent at the time of or rendered insolvent by the transfers or whether the Defendant intended or believed that the Plaintiff would incur debts that would be beyond its ability to pay as such debts matured.

*Lingham Rawlings, LLC v. Gaudiano (In re Lingham Rawlings), LLC*, No. 10-3125, 2013 WL

1352320, at *26 (Bankr. E.D. Tenn. Apr. 3, 3013).

**1.      Dispute Regarding Whether a Transfer Occurred**

The Trustee argues that the Defendant received title to the Properties without providing

any consideration to the Debtors in exchange. There appears to be no dispute that the funds to

purchase the Properties came from the Debtors' Management Account on May 17, 2013. There

is no dispute that the Properties worth approximately $150,000 were given to the Defendant

prepetition and removed $150,000 in cash from the Debtors' estate. There is no genuine dispute

regarding whether a transfer of the Debtors' property was made by the Debtors.

**2.      Dispute Regarding Whether the Transfer Was a Transfer of Property of the Estate for Less than Reasonably Equivalent Value**

The question remains whether the Debtors received reasonably equivalent value for the transfer

of the value of the Properties. Section 548 also requires that the debtor receive less than

reasonably equivalent value for the transfer. 11 U.S.C. § 548(a)(1)(B). The Sixth Circuit has

addressed the meaning of "reasonably equivalent," which is undefined in the Bankruptcy Code.

*See In re Congrove*, No. 04-8049, 2005 WL 2089856, 330 B.R. 880, at *3 (B.A.P. 6th Cir. 2005)

*aff'd*, 222 F. App'x 450 (6th Cir. 2007).  There, the 6th Circuit Bankruptcy Appellate Panel noted

that:

> In determining whether value is reasonably equivalent, focus should be placed upon the consideration received by the debtor rather than the value given by the transferee:
>
>> [T]he proper focus is on the net effect of the transfers on the debtor's estate, the funds available to unsecured creditors. As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred.
>
> "[I]t is clear that the debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value."

*Id.* (quoting *Harman v. First Am. Bank (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479,

484 (4th Cir. 1992) and *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6

F.3d 1119, 1125-26 (5th Cir. 1993), *abrogated on other grounds by Texas Truck Ins. Agency, Inc.*

*v. Cure (In re Dunham)*, 110 F.3d 286, 289 (5th Cir. 1997)).

In general, where the central issue in dispute is whether a debtor received reasonably

equivalent value in exchange for a transfer, the question is one of fact. *See Lisle v. John Wiley &*

*Sons, Inc. (In re Wilkinson)*, 2006 WL 2380887, 196 F. App'x 337, 341 (6th Cir. Aug. 17, 2006)

(citing *In re Humble*, 19 F. App'x 198, 200 (6th Cir. 2001)); *Webb Mtn, LLC v. Executive Realty*

*Partnership, L.P. (In re Webb Mtn, LLC)*, 420 B.R. 418, 432-33 (Bankr. E.D. Tenn. 2009).  In *In*

*re Wilkinson* the Sixth Circuit further instructed that "[a] court considering this question should

first determine whether the debtor received *any* value in the exchange. If so, the court should

determine if the value received was reasonably equivalent." 196 F. App'x at 341 (citing *Pension*

*Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp.*

*Retirement Plan No. 003 (In re Freuhauf Trailer Corp.)*, 444 F.3d 203, 212 (3d Cir. 2006)). Further, "'[i]n assessing whether a challenged transfer is supported by reasonably equivalent value, courts generally compare the value of the property transferred with the value of that received in exchange for the transfer.'" *In re Webb Mtn, LLC*, 420 B.R. at 433 (quoting *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 707 (6th Cir. 1999)). Courts may consider fair market value or the elimination of an antecedent debt as factors in this assessment. *See In re Webb Mtn, LLC*, 420 B.R. at 433.

The Defendant admits that some of the funds used to purchase the Properties came from her parents, the Debtors. Her mother, Rhonda Walker, states that "approximately $51,000.00 of the total needed to buy the two properties (just under $151,000) came from funds Mr. Walker and I provided." R. Walker Aff., ¶ 6. Thus, it appears to be undisputed that $51,000 was property of the Debtors that was used to fund the purchase of the Properties for the Defendant. The affidavit does not offer any evidence that this sum was provided on account of the accumulation of rentals or as a loan with repayment terms. There appears to be no dispute as to the transfer of that amount for no consideration.

As to the remaining balance of the value of the Properties, the Defendant has offered other evidence in the form of several affidavits to rebut the Trustee's argument that she provided no consideration for the Properties. She asserts under oath that she owns 23 rental properties that her father manages for her and that the income received from the rentals is recognized on her tax returns each year. C. Walker Aff., ¶¶ 3, 5. She states that "most of the money required" to buy the two Properties came from her. *Id.* at ¶ 7. She contends that "[a]t the time of the purchases, I had cash available in the management account to pay part of the sales price for the two properties. Meanwhile, my brother and my aunt provided a portion of the funds by way of

loans." *Id.* at ¶ 8. She also asserts that "a part of the money used to buy the tracts came from the sale of a secured note" to BIMI for $45,000 in April of 2013. *Id.* Mrs. Walker also contends under oath that the Defendant "had accumulated funds which were applied to buy the two tracts." R. Walker Aff., ¶ 6. In addition, the Defendant's brother has declared under oath that he "made a loan to [the Defendant] to help come up with the monies needed to" purchase the two Properties. B. Walker Aff., ¶ 4.

The Defendant did not provide the court with any specifics about the exact amount that she was owed on May 17, 2013 as a result of the collection of her rentals by her father, but the three affidavits create a factual issue as to the consideration and whether there was any antecedent debt satisfied by purchase of the Properties in her name.

The Trustee's response to the Defendant's response contends that the Defendant's evidence in opposition to his motion for summary judgment is too vague and speculative to survive summary judgment. [Doc. No. 19]. His response to the Defendant's statement of additional undisputed facts states that the Defendant "has never furnished an accounting to this court of what funds of hers . . . might be in the management account. Further, the evidence shows substantial new inflows into the account from the Debtors on May 17, 2013 to fund the purchase of the two houses." [Doc. No. 20, Trustee's Response to Defendant's Additional Undisputed Material Facts, ¶ 15]. However, the court notes that the exhibits provided by the Trustee in support of the source of the "new inflows" has accounting designations that create a question about whether there was a satisfaction of antecedent debt owed to Ms. Walker. [Doc. No. 14-1, Ex. E-1, F-1].

The Trustee disputes that the Defendant "held funds in the Don Walker Rentals management account . . . and had cash available to apply to the purchases of the properties."

[Doc. No. 20]. The Defendant has offered evidence that there were such funds. The court will have to make the factual determination at trial as to whether the amounts owed by Walker Rentals to the Defendant exceeded the value of the Properties she received. The court will not grant summary judgment for an amount in excess of $51,000 because a genuine dispute remains.

### 3.    Issues of Fact Regarding the Insolvency of Rhonda Walker

The Trustee relies on Section 548(a)(1)(B)(ii)(I) for the second prong of his Section 548 claim. The Defendant contends that there is a factual dispute with respect to this element of the claim. This prong requires that the Debtor be "insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation . . . ." 11 U.S.C. § 548(a)(1)(B)(ii)(I). The Bankruptcy Code defines "insolvent" as

> With reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—
> (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
> (ii) property that may be exempted from property of the estate under section 522 of this title; . . .

11 U.S.C. § 101(32)(A). As the bankruptcy court in *In re Eubanks* explained, "[t]he basic requirement of this form of insolvency is that a debtor's assets exceeded her liabilities on the date that the transfer in question took place." 444 B.R. at 426.

When a defendant fails to file affidavits or excerpts from the record, courts have been willing to grant a trustee summary judgment on a Section 548 avoidance claim, including a finding of insolvency based on the assets and liabilities listed in the debtor's schedules. For example, in *In re Goldstein* the court concluded that the insolvency question was undisputed "[b]ased upon the Debtor's schedules and his testimony that his financial situation as reflected in the schedules was substantially comparable to his financial situation at the time of the Transfers,

it is not disputed that Mr. Goldstein was insolvent on the date of the Transfers." *Hagan v. Goldstein (In re Goldstein)*, 428 B.R. 733, 736 (Bankr. W.D. Mich. 2010). The court further noted that the "schedules reflect debts in an amount exceeding $8.1 million and property valued at less than $2.5 million." *Id.*

In this proceeding the Trustee has filed an affidavit under oath indicating the review of the Debtors' financial affairs which he has undertaken. In his affidavit he testifies that:

> At the same time the Fuller Road and Standifer Gap properties were transferred in May 2013, both Debtors were Defendants in a lawsuit in the Chancery Court of Hamilton County Tennessee, Docket # 11-0536. This suit was filed by a creditor, FirstBank, on July 13, 2011. It sought a money judgment in excess of $6,000,000.00 associated with the Debtors' breach of numerous promissory note obligations and guaranty agreements.

> As Chapter 7 Trustee, I am familiar with the value of the Debtors' assets and the extent of their liabilities in May and June, 2013. Based on a review of their records, the petition and my knowledge of the net values of their properties, the Debtors were balance sheet insolvent by at least $10,000,000.00 on May 17, 2013. This condition did not change materially from then to the petition date.

Paris Aff., ¶¶ 19-20. The Debtors' Amended Summary of Schedules filed shortly after the filing of the bankruptcy petition indicates that the Debtors had assets of $3,328,620.76 and liabilities of $14,104,843.49. [Bankr. Case No. 13-13184, Doc. No. 37].

The Debtor Rhonda Walker has submitted an affidavit challenging the conclusion that can be drawn from the schedules. R. Walker Aff. Her affidavit states:

> Although I am a Debtor in this matter, there remains a question of whether I am liable on a particular debt allegedly owed to FirstBank of over six million dollars. I have raised a defense and counterclaim to the guaranty I signed at the demand of the bank on the grounds that their actions violated the Equal Credit Opportunity Act . . . . The case was filed in the Hamilton County Chancery Court as case no. 13-0947, *FirstBank v. Elbert Donald Walker and Rhonda P. Walker*, remains pending. If I am successful, I aver that I am [not] insolvent at all.

R. Walker Aff., ¶ 8.

This statement by Mrs. Walker does not raise a genuine issue of fact. Taking the

20

statement in the light most favorable to Mrs. Walker, the court will remove from the total liabilities attributable to FirstBank scheduled by the Debtors. Based on the amounts listed in the most recent version of Schedule F, the amount listed for FirstBank is $6,708,935.07. [Bankr. Case No. 13-13184, Doc. No. 29, pp. 2-3]. The total of unsecured debts was $11,188,218.54. *Id.* at p. 6. Without the FirstBank debt, there remains $4,479,283.47 of unsecured debt. Schedule D reflects additional secured debt of $2,619,557, for total liabilities, without FirstBank, of $7,098,840.47.

On the asset side, in October of 2013, the Debtors amended their schedules to reflect real property values of $2,458,630. [Bankr. Case No. 13-13184, Doc. No. 194]. The list also included fifteen properties whose value was listed as "unknown," and their value was not included in the totals, but a collective value of $1,505,500 was given in the description for fourteen of the properties based on their tax appraisal. The fifteenth property was 515 Airport Road which was "appraised in 2013" but no value was given. [Bankr. Case No. 13-13184, Amended Schedule A, Doc. No. 194, p. 1]. In 2014, 513 and 515 Airport Road were sold for $475,000. [Bankr. Case No. 13-13184, Doc. Nos. 437, 440]. For purposes of this motion, the court will attribute the entire sales price to 515 Airport Road. The sum of the stated values on Schedule A, plus values derived from the tax appraisal plus the sales proceeds brings the total asset value for real property to $4,439,130.

The value listed for personal property on Schedule B was $1,134,120.76. Adding that to the real property value brings total asset value to $5,573,250.76. When the asset value is compared to liabilities without FirstBank of $7,098,840.47, Mrs. Walker's joint and individual liabilities are approximately $1,500,000 more than the assets.

After viewing the facts in the light most favorable to the Defendant, the court does not

find that there is any genuine dispute of material fact regarding Mrs. Rhonda Walker's insolvency.

### IV.    Conclusion

As to $51,000, the court finds that there is no genuine dispute as to any fact material to the court finding a fraudulent transfer occurred. The court will grant in part the Trustee's motion for summary judgment and grant the Trustee a judgment for $51,000 which represents the funds given by the Debtors while they were insolvent for less than reasonably equivalent value to the Defendant and which were used to purchase the Properties. As to the transfer of the remaining amount used to purchase or the amount used to repair the Properties, the Trustee's motion will be denied.

The Trustee's motion for partial summary judgment regarding his Section 548 fraudulent transfer claim will be denied in part and granted in part. The motion for partial summary judgment will be GRANTED for $51,000. As to the amounts claimed in excess of $51,000, the Trustee's motion is denied.

A separate order will enter.

# # #